**Opinion issued August 21, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-23-00725-CV**

———————————

## IN THE INTEREST OF A.P.L. AND T.D.L., MINOR CHILDREN

———

On Appeal from the 247th District Court
Harris County, Texas
Trial Court Case No. 2015-64508

———

* * *

———————————

**NO. 01-23-00843-CV**

———————————

## IN RE L.L., Relator

**O P I N I O N**

In this appeal from a final order modifying conservatorship of the parties' two children, Mother argues the trial court abused its discretion by granting Father's petition to be given the exclusive rights to designate the children's primary residence and make medical, mental-health, and education decisions for them. Mother also challenges, in the appeal and in her related mandamus proceeding, the trial court's order requiring her to pay some of Father's attorney's fees under section 109.001 of the Family Code. Because the attorney's fee issue can be reviewed as part of the appeal, we deny the mandamus petition. We affirm the trial court's judgment.

## I. Background

**A.   The parties divorce and agree to be joint managing conservators**

Mother and Father divorced in 2017 under a mediated settlement agreement that provided the terms for conservatorship and support of their minor children, A.P.L. and T.L.[1] The trial court signed an agreed final decree that contained the

---

[1]      We use initials to protect the children's privacy. *See* TEX. FAM. CODE § 109.002(d).

parties' agreements. Among other terms, the agreed final decree designated Mother and Father as joint managing conservators of the children and ordered that:

- Mother have the exclusive right to designate the children's primary residence.

- The children stay with Father on alternating weekends and at additional times around holidays and summer break.

- Mother, who is Christian, have the children on Christian holidays, and Father, who is Jewish, have the children on Jewish holidays.

- Mother and Father have joint rights to consent to (1) non-emergency medical, dental, and surgical treatment involving invasive procedures, and (2) mental-health treatment and evaluation of the children, provided that "no child shall be administered any stimulant or other psychotropic medication without the express written agreement of the other party or further order of the court."

- Mother and Father have joint rights to make decisions concerning the children's education.

- Father must pay monthly child support.

The agreed final decree included tiebreaker provisions in the event of a disagreement between Mother and Father about the children's medical, mental-health, or educational needs. For instance, if Mother and Father disagreed about medical or mental-health treatments, the children's pediatricians' recommendation would prevail in most cases. The parties designated specialists for certain medical conditions—namely, an endocrinologist for treatment of T.L.'s pituitary dwarfism and an allergist for A.P.L.'s allergies, asthma, and eczema.

3

As for the children's education, the agreed final decree allowed for their continued enrollment at the private school they attended ("the Private School"). The agreed final decree required the children to attend the Private School if either parent "enrolls and pays," which the decree defined as registering the child by the school's deadline, paying the tuition, and providing written notice to the other parent by a certain date. If the children were not enrolled in the Private School, then they would attend the public school zoned for Mother's residence, unless Mother and Father mutually agreed otherwise in advance.

**B.    Father petitions to modify the agreed final decree, and Mother counterpetitions**

A little more than three years after the divorce, Father petitioned to modify the agreed final decree. He alleged that the parties' circumstances had materially and substantially changed and that Mother was engaging in alienating behavior and disparaging him, his family, and his religion. Father asked the trial court to give him exclusive rights to designate the children's primary residence and make medical, mental-health, and education decisions for them, eliminate his child-support obligation, and grant Mother a standard possession order.

Mother filed a counterpetition in which she also alleged that the parties' circumstances had materially and substantially changed. She asked the trial court to maintain her right to designate the children's primary residence and give her, not Father, the exclusive right to make medical, mental-health, and education decisions.

4

Mother also asked the trial court to adjust the possession schedule and order the children enrolled at the public schools zoned to her residence.

## C. A trial shows inability to co-parent as the children's needs changed and Father planned to remarry

During a ten-day bench trial, the parties offered testimonial evidence and dozens of exhibits. Both sides presented evidence of the children's medical, mental-health, and educational needs, some of which predated the divorce and others of which had developed since the divorce. The evidence showed that A.P.L. has been treated for allergies and eczema since she was four, and that T.L. was diagnosed by his endocrinologist with pituitary dwarfism at three and takes growth hormones by injection six nights a week.

As the children grew older, these conditions evolved, and the co-parenting relationship became strained. For example, A.P.L. struggled with anxiety, attention, and focus at school. In August 2018, speech pathologist K. Musher evaluated A.P.L. "to get a better understanding of her learning profile." In her report, Musher noted A.P.L. was having increasing difficulty in reading and math at school. The Private School staff had expressed concern for whether A.P.L. could keep up as she transitioned grades and recommended that she be evaluated to "identify any factors which could be interfering with her learning" and "receive recommendations for appropriate intervention." The evaluation led Musher to conclude that A.P.L. had a "specific learning disorder with impairment in reading." She opined that other

5

factors also might be interfering with A.P.L.'s learning, including an attention-deficit disorder or emotional factors related to family stress. Musher recommended several intervention therapies, including specific therapies related to reading comprehension, certain accommodations at school, and tutoring. She also recommended a formal assessment in those areas if people working with A.P.L. felt that "difficulty with attention and/or emotional factors [was] interfering with her optimal learning, performance, and response to intervention."

In August 2019, the Private School met with Father and Mother to recommend that A.P.L. undergo a formal psychoeducational evaluation and provided a list of psychologists.[2]   Mother and Father disagreed about how to handle this recommendation. In correspondence with the Private School, Mother dismissed the school's concerns as inconsistent with A.P.L.'s academic performance and as being a private family matter. She attributed A.P.L.'s anxiety to poor parenting by Father, claiming that A.P.L.'s anxiety stemmed from not being "prepared [for] her studies . . . the next day after visiting her father." Father, on the other hand, approved of the school's efforts and advice. He described Mother as "[a]bsolutely

---

[2]    A school counselor explained that a psychoeducational evaluation is a "complete evaluation of a child" that provides "information about their academic abilities, their IQ, behavioral, social, emotional, sort of a whole picture of the child", along with recommendations "for school and at home so that everyone . . . on the student's team can help put things in place to support the child." She explained why the evaluation was important: "If a child is struggling it helps to clarify what's going on. So it often provides a diagnosis."

6

against" the professionals and "unappreciative" of their concern for A.P.L.[3] In his view, Mother obstructed the care A.P.L. needed.

A.P.L. was eventually tested and diagnosed with ADHD in 2021, about a year and a half after the Private School suggested the testing. The neuropsychologist, Dr. Raizner, expressed that A.P.L. "exhibits clinically significant attention problems and was rated 'at risk' for hyperactivity and conduct problems." The doctor's report recommended "an executive functioning specialist, classroom accommodations, and consultation with [A.P.L.'s] pediatrician to determine whether she would be an appropriate candidate for medical management of symptoms."

Family strife continued over treatment for A.P.L.'s ADHD, with Father supporting medication, and Mother opposing it in favor of education therapy and tutors. A.P.L. had also expressed some reservations about medication. The disagreement was submitted to A.P.L.'s pediatrician, Dr. Koush, who recommended "both behavioral strategies for ADHD (including accommodations at school) and a

---

[3] There was conflicting evidence on whether Mother's approach toward the teachers and staff at the Private School risked A.P.L.'s continued attendance at the school. Mother claimed that after a meeting at the school to discuss A.P.L.'s needs, school personnel met with her separately to criticize Father for involving the school in family disputes. However, staff from the school disputed that characterization of the second meeting. In an email, they stated that Mother had mischaracterized the conversation, which was "about [Mother's] inappropriate tone in emails and the difficulty [the Private School] had in scheduling the meeting [to discuss A.P.L.'s needs] with [Mother]." The email closed by requesting that Mother direct any further emails concerning A.P.L. or T.L. to the administrators, rather than the children's individual teachers because of the "growing problem with communication."

trial of medication." Despite Dr. Koush's recommendation, Mother and Father continued to disagree about when A.P.L. should start medication, as well as where and how often she should take it.

The parties had still not reached an agreement a few months later, when A.P.L.'s behavioral problems worsened. By then, Father had filed his petition to modify the agreed final decree, and with the support of the children's amicus attorney, obtained a trial court order for A.P.L. to begin a drug trial. The trial began while A.P.L. was in Mother's care, but when Mother emailed A.P.L.'s psychiatrist, Dr. Katic, two days later with a lengthy list of symptoms A.P.L. was experiencing, Dr. Katic recommended that Mother stop giving A.P.L. the medication and that the parties find a different psychiatrist "who may be able to help A.P.L." Father expressed his belief that Mother had intentionally "sabotaged" the drug trial and "brainwashed" A.P.L. into opposing the medication. To accommodate A.P.L.'s needs, Mother and Father eventually made the decision to move A.P.L. to a less rigorous, remedial school.

T.L. also had specific medical needs about which Mother and Father disagreed. In August 2022, T.L. had not been formally diagnosed with any learning disabilities but was showing indicators for dyslexia and dysgraphia. To provide T.L. with accommodations at school, the Private School required an evaluation by a psychologist. Dr. Koush recommended the same psychologist who had performed

8

A.P.L.'s evaluation, Dr. Raizner, but Dr. Raizner declined because of the pending litigation. The parties' disagreement over alternatives worsened, and Dr. Koush, the pediatrician designated as a tiebreaker, declined any further involvement, making her the third medical provider to decline further involvement. Dr. Koush explained via email, "This issue has unfortunately become far too contentious for what should be a simple decision. Legal has advised me not to comment further." This delayed T.L.'s evaluation.

Ultimately, T.L. was evaluated by Dr. Landis in December 2022, and she diagnosed him with dysgraphia and a learning disorder with impairment in reading. Dr. Landis recommended two hours of weekly educational therapy, which was less than a previous recommendation of nine hours. Dr. Landis also believed that T.L. had progressed beyond a previously recommended curriculum focused on decoding words rather than reading comprehension, something Father claimed supported his view that T.L. had outgrown aspects of his condition.

Similar issues arose regarding T.L.'s growth-hormone deficiency and the injections he was prescribed to support his development until he reaches puberty. According to Mother, Father disagreed with T.L.'s diagnosis and suggested alternative treatments that were rejected by T.L.'s endocrinologist. Evidence suggested that Mother sometimes gave T.L. extra doses to make up for the doses she believed Father was not giving. But Father expressed at trial his agreement that it

was necessary to administer the growth hormone as prescribed. Father conceded that he had occasionally missed a dose because T.L. was participating in social activities and was embarrassed to receive an injection in front of others. He claimed that any long gaps in administering the growth hormone were due to national shortages or denial of insurance coverage for the injections, which were expensive.

Family strife was not limited to the children's medical and mental-health needs. The parties disagreed about where the children, particularly A.P.L., should attend school, with both accusing the other of involving A.P.L. in the disagreement and having inappropriate conversations with her regarding enrollment preferences. Additionally, Father claimed at trial that Mother sometimes made it difficult for him to exercise periods of possession with the children; had disparaged his Jewish faith, disparaged his family, which included a new fiancée and her children from a prior relationship; and threatened to impair his relationship with A.P.L. and T.L. A few examples include that Mother involved the children in negotiations with Father over possession schedules and included A.P.L. in a disagreement with Father about discipline and extracurricular activities. There was also evidence that Mother has called Father a "low life" and an "incompetent parent," and "flipped [him] off" in front of T.L.

For her part, Mother offered explanations for the claimed interference with Father's parenting and testified that she was the parent who encouraged a positive

relationship between the children and Father. She also offered evidence that she had primary responsibility for selecting the children's doctors, taking them to appointments, and obtaining diagnosis and treatment for their medical conditions, whereas Father had little involvement in the children's medical treatment.

A.P.L. and T.L. were interviewed by the trial court under oath. T.L., who was ten at the time, told the trial court everything at home was "good." He did not identify anything he wished to change about either parent's home, which he described as being mostly the same. T.L. admitted that he did not like "spending a lot of time" with Father's fiancée even though she was "nice." A.P.L., then fourteen, expressed a preference to live with Father. A.P.L. explained that while she loved both parents, Mother sometimes made her feel bad about herself, and A.P.L. could be "more like a teenager" at Father's house. A.P.L. was aware of the parental conflict. Asked if she could remember a time when her parents got along, she answered: "Nope. Never. They can never agree on anything."

In closing arguments, the court-appointed amicus attorney acknowledged that the children's needs had substantially changed and that the "severe" parental conflict had reached the point at which the provisions in the agreed final decree no longer made sense. The parental conflict had "trickled into" the children's medical appointments and evaluations, causing more than one of the professionals designated as a tiebreaker to withdraw from that role. After recognizing the "close, loving

11

relationships" between each child and both parents and both parents' good intentions, the amicus attorney opined that it would be in the children's best interest for Mother to retain the exclusive right to designate the children's primary residence and be given the exclusive right to make their medical, mental-health, and education decisions.

**D.    The trial court modifies the agreed final decree to give Father exclusive rights**

After considering the evidence and arguments of counsel, the trial court signed a rendition and, three months later, a modified order granting Father the exclusive rights to designate the children's primary residence and, with prior written notice to Mother, make medical, mental-health, and education decisions for them. The trial court also terminated Father's child support obligation and granted Mother a standard possession order.

The trial court issued findings of fact and conclusions of law in support of its ruling, including findings under section 156.101 of the Family Code that the circumstances of Mother, Father, "and/or" the children had materially and substantially changed and that it was in the children's best interest for Father to have the exclusive rights to designate their primary residence, consent to medical procedures and mental-health care, designate the children's schools, and make decisions regarding their education. The trial court further found:

12

6. The parents have become unable to co-parent to promote the children's best interests;

7. The tiebreaker terms of the [agreed final decree] became ineffective either because a designated tiebreaker declined to decide an issue, refused to work with the high-conflict parents, or because one or more of the parties involved additional professionals besides those listed in the order;

8. The parties are unlikely to reach agreements about any issue that has a significant effect on the children's health and welfare, and therefore it is in the child's best interest for one parent to be primarily in charge of all such decisions;

9. [Mother] has exposed the children to hostility directed at [Father]; [and]

10. [Mother] has attempted to minimize or thwart the children's contact with [Father.]

. . .

12. The relationship between [Mother] and [Father] is a high-conflict relationship, especially in the context of making medical, psychiatric/psychological, and educational decisions for the children. This difficulty is primarily prompted by [Mother's] disruptive and combative conduct, which is inconsistent with good co-parenting.

13. [Father] is the parent who is most likely to encourage a positive relationship with the other parent. [Father] has demonstrated a desire, willingness, and ability to engage in proper communication and cooperation with [Mother] regarding these decisions, which is consistent with good co-parenting.

14. [Father] has demonstrated the ability to make medical, psychiatric/psychological, educational, and other decisions for the children that are in their best interest. [Mother] has failed to demonstrate the ability to make medical, psychiatric/psychological, educational, and other decisions for the children that are in their best interest.

13

Although Mother requested additional findings on how each modification was connected to the changed circumstances and why it was in the children's best interest, the trial court made none.

**E.      Mother asks the trial court to abate the modification order pending her appeal**

Mother filed an emergency motion to abate and suspend the modification order under section 109.001 of the Family Code. *See* TEX. FAM. CODE § 109.001(a) (authorizing trial court to "make any order necessary to preserve and protect the safety and welfare of the child during the pendency of an appeal as the court may deem necessary and equitable"). The motion stated Mother's intention to appeal the modification order and requested that her rights to make decisions about the children's medical and educational care be restored during the appeal. She alleged that, since the rendition, Father had not met the children's medical and educational needs in several respects, including by not obtaining and administering T.L.'s growth hormone, not arranging for T.L. to receive educational therapy, and not arranging for A.P.L. to receive executive functioning tutoring. Mother also claimed Father had enrolled A.P.L. at a high school that was not A.P.L.'s preferred school and was "far away from her friends" and "cherished extracurricular activities." In a supplement to the motion, Mother also requested that the trial court award her reasonable and necessary attorney's fees and expenses she incurred in bringing the motion to abate.

14

Father opposed Mother's motion and asked the trial court to order Mother to pay his attorney's fees. Under section 109.001, Father claimed that an award of fees was necessary to the children's safety and welfare during the pendency of the appeal because he is "the parent with primary responsibility" for the children and has "insufficient resources" to pay the fees for defending against Mother's emergency motion and appeal. Alternatively, Father requested fees "as monetary sanctions for filing the emergency motion."

The trial court held an evidentiary hearing, after which it denied Mother's motion. Relying on section 109.001, the trial court awarded Father $103,006 in attorney's fees for responding to Mother's emergency motion and an additional $173,250 in conditional appellate fees.

## II. Standard of Review

Mother challenges the trial court's final order modifying conservatorship of the children and temporary order awarding Father attorney's fees. We review both orders for an abuse of discretion and will set them aside only if the trial court acted arbitrarily or unreasonably or failed to analyze or apply the law correctly. *Smith v. Karanja*, 546 S.W.3d 734, 737 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (modification order is reviewed for abuse of discretion); *In re Wiese*, No. 03-15-00062-CV, 2015 WL 4907030, at *1 (Tex. App.—Austin Aug. 12, 2015, orig.

proceeding) (mem. op.) (temporary order for fees under section 109.001 is reviewed for abuse of discretion).

In family-law cases, the traditional sufficiency standards of review overlap with the abuse-of-discretion standard. This means insufficiency of the evidence is not an independent ground for reversal but an order that is not supported by sufficient evidence may constitute an abuse of discretion. *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (noting that legal and factual insufficiency are relevant factors in assessing whether the trial court abused its discretion); *Zeifman v. Michels*, 212 S.W.3d 582, 587–88 (Tex. App.—Austin 2006, pet. denied) (same). To determine whether a trial court abused its discretion because the evidence does not support its decision, we consider whether the trial court (1) had sufficient information upon which to exercise its discretion and (2) erred in applying its discretion. *Zeifman*, 212 S.W.3d at 588.

The first question is answered by the well-established standards for legal and factual sufficiency. Evidence is legally sufficient if there is "more than a mere scintilla" to support a vital fact finding, that is, "the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Mehta v. Mehta*, No. 23-0507, __ S.W.3d __, 2025 WL 1733267, at *3 (Tex. June 20, 2025) (quotation omitted). We consider the evidence in the light most favorable to the finding, indulging every reasonable inference that supports it. *Id.* But in a

16

factual-sufficiency review, we examine all the evidence in a neutral light and consider whether the trial court's decision is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam).

As the factfinder, the trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005) ("[Trial courts] may choose to believe one witness and disbelieve another. Reviewing courts cannot impose their own opinions to the contrary."). When there is conflicting evidence, we must presume the trial court resolved any inconsistences in favor of the order if a reasonable person could do so. *Id.* at 821; *see also Ceniseros v. Rychlik*, No. 03-17-00532-CV, 2018 WL 4265679, at *3 (Tex. App.—Austin Sept. 7, 2018, no pet.) (mem. op.) (explaining the trial court can best "observe the demeanor and personalities of the witnesses and . . . 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record" (internal quotation omitted)).

In answering the second question—whether the trial court erred in applying its discretion—we consider whether the trial court made a reasonable decision based on the evidence. *Zeifman*, 212 S.W.3d at 588. Or stated inversely, we determine whether there is some basis for concluding that the trial court's decision was neither arbitrary nor unreasonable. *Id.*

To the extent our review involves questions of statutory construction, those are questions of law we review de novo. *See ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 899 (Tex. 2017).

### III. Modification of Conservatorship

The law gives every parent a bundle of rights that includes, among others, rights to designate a child's primary residence, consent to medical and mental-health care, and make decisions about the child's education. *See* TEX. FAM. CODE § 151.001(a)(1), (6), (10). In the first three issues of her appeal, Mother contends the trial court abused its discretion by modifying the agreed final decree to designate Father as the parent with the exclusive right to exercise these rights for several reasons, including that:

- there was no change to "the children's welfare" that warranted her removal as the parent with the right to designate the children's primary residence;

- the only justification the trial court gave for the modifications—parental conflict—does not suffice because she and Father had always disagreed and the final decree designated tiebreakers for resolving disagreements;

- the trial court should have tried "less disruptive modifications," such as amending the tiebreaker provisions or awarding exclusive decision-making rights to Mother; and

- the modifications are not in the children's best interests.

Mother also argues that the trial court's fact findings are deficient because they do not specify the reasons for the modifications.

18

## A.     General law on modification

The best interest of the child is always the primary consideration in issues of conservatorship and possession of and access to the child.  *See* TEX. FAM. CODE § 153.002.   Relevant here, a court can modify the terms of conservatorship, possession, or access if the movant shows (1) modification is "in the best interest of the child" and (2) "the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed" since the earlier of rendition of the order or the signing of the mediated settlement agreement on which the order is based.  TEX. FAM. CODE § 156.101(a)(1).

The question of a material and substantial change concerns "all aspects of a child's physical, mental, emotional and moral well-being."  *Snider v. Grey*, 688 S.W.2d 602, 606–07 (Tex. App.—Corpus Christi-Edinburg 1985, writ dism'd).  The requested modification must be "somehow connected to the changed circumstance." *Smith*, 546 S.W.3d at 741.  But the determination of a material and substantial change is not confined by rigid guidelines; instead, it is fact specific.  *In re A.L.E.*, 279 S.W.3d 424, 428–29 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("[T]he law does not prescribe any particular method for a showing of changed circumstances, which may be established by circumstantial evidence.").

The person seeking the modification must show the circumstances as they existed when the prior order was signed.  *Nalley v. Quevedo*, No. 01-20-00400-CV,

19

2022 WL 1547780, at \*8 (Tex. App.—Houston [1st Dist.] May 17, 2022, no pet.) (mem. op.). "Without both historical and current evidence of the relevant circumstances, 'the court has nothing to compare and cannot determine whether a change has occurred.'" *Nellis v. Haynie*, 596 S.W.3d 920, 926 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *Ziefman*, 212 S.W.3d at 594 n.1).

To review the best interest of the child, we rely on what are known as the *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The non-exhaustive factors include (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by the individuals seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Id.* The trial court is not required to consider every factor, and although no single one is controlling, a single factor may, in some instances, be sufficient to support a best-interest finding. *Ceniseros*, 2018 WL 4265679, at \*5.

**B.**     **Modification of the right to designate the children's primary residence**

Mother contends the trial court was "wholly unjustified" in modifying the agreed final decree to give Father the exclusive right to designate the children's primary residence. She asserts there is no evidence of "abuse, violence, drugs, alcohol, endangerment, mistreatment, poisoning the children's mind," no evidence of "any negative circumstance with respect to the children's welfare," no evidence of a "change in [her] home surroundings," and no evidence that she "became an improper parent to exercise custody, like refusing to care for the children."

We agree with Mother that there is no evidence she abused the children, was violent, exposed the children to drugs or alcohol, allowed them to go hungry, or engaged in any parental misconduct of that type. Evidence of such parental misconduct would be relevant in a modification proceeding, but it is not required. As noted, the law does not prescribe any particular method of showing changed circumstances.[4] *See, e.g.*, *In re R.R.K.*, No. 02-20-00302-CV, 2022 WL 1257136, at *5 (Tex. App.—Fort Worth Apr. 28, 2022, no pet.) (mem. op.). And other events

---

[4]     Similarly, to the extent Mother argues the trial court must make a finding that retaining her as the primary conservator would be injurious to the children, we disagree. Earlier versions of the Family Code required showings that a modification would be a positive improvement for the child and that retention of the current conservator would be injurious, but the current version of the Family Code does not. *See In re J.J.L.*, No. 04-12-00038-CV, 2012 WL 3985798, at *1 (Tex. App.—San Antonio Sept. 12, 2012, no pet.) (mem. op.). In the current version, the overriding "best interest of the child" standard takes into consideration whether a modification is appropriate. *See id.*; *see also* TEX. FAM. CODE § 156.101.

21

may indicate a material and substantial change, such as the evolving needs of a child, one parent impeding the other's ability to participate in joint decisions for the child, and one parent attempting to impair or interfere with a child's relationship with the other parent. *See id.* at *8–10; *Arrendondo v. Betancourt*, 383 S.W.3d 730, 734–35 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *Randle v. Randle*, 700 S.W.2d 314, 316 (Tex. App.—Houston [1st Dist.] 1985, no writ).

There is no real dispute that A.P.L.'s and T.L.'s needs changed after the divorce, as they got older. Although aging alone does not show changed circumstances, developing needs may. *See Randle*, 700 S.W.2d at 316 (recognizing that a child's needs may change with age and justify modification of conservatorship and that modification may bring stability for the child). Mother agreed at trial that a "host" of evolving issues exists on the educational and medical front for both children, as well as psychological and behavioral issues for A.P.L.

For example, after the agreed final decree was signed, A.P.L. increasingly struggled with anxiety, focus, and behavior at school, was moved from a more rigorous academic program to a remedial school, and now requires specific interventions for ADHD. The record includes several examples of A.P.L.'s behavioral issues, including disregarding teacher instructions, acting out during class, making social-media posts both parents deemed inappropriate, and taking

suggestive photographs.[5] Additionally, there is evidence that T.L.'s needs related to his growth-hormone treatment and learning disabilities were evolving as he matured.

Mother asserts that the evidence of the children's evolving needs goes exclusively to a different parental right—the right to make medical, mental-health, and education decisions—and cannot be the basis for eliminating her right to designate the children's primary residence. In support, she again cites *Smith*, which held that a modification lifting all restrictions on international travel could not be based solely on a mother's desire for the child to attend a single funeral overseas. *See* 546 S.W.3d at 742. But *Smith* allows modifications that are "somehow connected to the changed circumstance." *See id.* at 741–42.

There is a connection here, considering evidence that Mother sometimes impaired Father's ability to be informed about and contribute to decision-making regarding the children's physical health. Father testified that he offered to share in the responsibility for making and taking the children to doctor's appointments because that was part of being involved in the children's lives. Although he asked Mother to notify him when the children had doctor's appointments so that he had the option to attend, she rarely did so in advance. And sometimes, he found out about the appointments only after the fact. In his words, "When I don't know before

---

[5]     Any suggestive photographs were not available as evidence at trial because Mother deleted them. Father testified he had not seen them. Mother also required A.P.L. to delete the problematic social-media posts.

23

something happens, I can't be there." Father also testified that Mother sometimes acted unilaterally regarding the children's medications—namely, that she stopped giving A.P.L. asthma medication without consulting him, which he believed caused A.P.L. to have an asthma attack, and gave T.L. extra doses of the growth hormone without consulting Father about whether he had given the medication.[6]

The record also includes several examples of Mother disparaging Father in correspondence with the children's care providers, such as referring to Father as a "heavy manipulator" in correspondence with Dr. Koush, suggesting to T.L.'s endocrinologist that Father was not keeping up with the growth-hormone injections and instead only giving "a shot on occasion, just to say to others that he gave him growth hormone," and claiming in emails with the Private School that Father was seeking meetings to discuss A.P.L.'s needs as "legal maneuvers" to improve his position for litigation.

Much of this evidence was disputed, with Mother presenting evidence that Father had not actually made any effort to make medical appointments for the children, was disinterested in attending appointments, and was the real obstacle to the children's wellbeing. But it was the trial court's responsibility to resolve conflicts in the evidence, and it could believe Father over Mother in doing so. *See*

---

[6] Father admitted that A.P.L.'s asthma is "not as significant" now as it was around the time of the attack, and she no longer takes the asthma medication.

24

*City of Keller*, 168 S.W.3d at 819. And this Court has recognized similar conduct as being relevant to a modification in the right to designate a child's primary residence. *See Epps v. Deboise*, 537 S.W.3d 238, 246–47 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (in considering finding of "material and substantial change," evidence of mother's interference with parental relationship impacting joint decision-making on medical and psychological care through failures to notify father of doctor's visits and impairing his ability to be informed supported changing parent with right to designate primary residence).

There is also evidence that Mother's conduct interfered with Father's relationship with the children. *See Champenoy v. Champenoy*, No. 01-12-00668-CV, 2013 WL 3327328, at *4 (Tex. App.—Houston [1st Dist.] June 27, 2013, no pet.) (mem. op.) ("A course of conduct by one parent that hamper's a child's opportunity to associate favorably with the other parent may suffice as grounds for re-designating managing conservators."). For example, there is evidence that Mother involved the children in disagreements about possession periods, discipline, and educational decisions, and questioned the children about the time they spent with Father. There is evidence that Mother made it difficult for the children to communicate with Father by confiscating phones he provided. And there is evidence Mother deprived Father of time with the children by not being honest about a tutor's availability to see A.P.L. at times other than during Father's

25

possession period, by directing tutoring to run long so that A.P.L. was late to softball games and practices Father coached, and by scheduling activities like dance class for A.P.L. during Father's time without his consent. Father testified that for the two years after the agreed final decree, Mother vacationed in Alabama with the children on Father's Day, even though the holiday was his to spend with the children and the decree required Mother to transfer possession of the children at her Texas home. He explained that, for one year, he traveled to Alabama to spend Father's Day there, and for another year, he flew to Alabama to retrieve T.L. Additionally, there is evidence that Mother allowed her negative feelings toward Father to spill into view of the children when she shot Father "the finger in front of T.L." and slammed a car door.

Such conduct interfering with or impairing Father's relationship with the children supports modification of the right to designate the child's primary residence. *See In re J.W.H.*, No. 14-09-00143-CV, 2010 WL 1541679, at *7 (Tex. App.—Houston [14th Dist.] Apr. 20, 2010, no pet.) (mem .op.) (in considering finding of "material and substantial change," evidence of mother's interference with visitation rights and communication constituted "behavior hamper[ing] the children's opportunities to favorably associate with" father and supported changing conservator with right to designate primary residence).

Again, much of this evidence was disputed, with Mother offering alternative explanations. But the trial court was free to disbelieve her. *See City of Keller*, 168

26

S.W.3d at 819. As this case demonstrates, conservatorship decisions are intensely fact driven and, oftentimes, difficult. *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002). The evidence was hotly contested, with the parties clashing over nearly all matters of fact. Under the abuse-of-discretion standard, it is not our role to reconcile disputed facts. We must defer to the factfinder who observed the witnesses' demeanor and was in the best position to make credibility determinations. *See In re A.L.E.*, 279 S.W.3d at 427. A trial court does not abuse its discretion when, as here, it bases its decision on conflicting evidence of a substantive and probative character. *See Townsend v. Vasquez*, 569 S.W.3d 796, 808 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). While the evidence was not one-sided, it is sufficient to support the trial court's finding of a material and substantial change warranting modification of the right to designate the children's primary residence. Mother's evidence was not so overwhelming as to make the trial court's decision against the great weight and preponderance of the evidence, clearly wrong, or manifestly unjust. *See Francis*, 46 S.W.3d at 242.

We overrule that part of Mother's first issue challenging the material and substantial change element of the modification of the right to designate the primary residence of the children.[7]

---

[7] The evidence discussed above also supports the trial court's more specific findings that Mother and Father had "become unable to co-parent"; the tiebreakers "became ineffective"; Mother had "exposed the children to hostility directed at [Father]" and

**C.** **Modification of the right to make medical, mental-health, and education decisions**

Within her first issue, Mother also contends Father failed to prove a material and substantial change required him to have exclusive decision-making rights as to the children's medical, mental-health, and educational needs. More specifically, she asserts that Father failed to offer evidence of more than mere parental conflict and disagreement over the children's medical, mental-health, and educational needs, which is insufficient to modify the agreed final decree.

But here, Father did not have to prove changed circumstances in connection with these rights, because both he and Mother asserted in their respective pleadings that a material and substantial change in the parties' circumstances required modification of their previous agreement on medical, mental-health, and education decisions. *See Hill v. Steinberger*, 827 S.W.2d 58, 61 (Tex. App.—Houston [1st Dist.] 1992, no writ) ("A judicial admission is conclusive on the party making it, and it relieves the opposing party's burden of proving the admitted fact[] and bars the

"attempted to minimize or thwart the children's contact with [him]"; Mother and Father's relationship was "high-conflict, especially in the context of making medical, psychiatric/psychological, and educational decisions for the children," and the "difficulty is primarily prompted by [Mother's] disruptive and combative conduct, which is inconsistent with good parenting"; and Father is "the parent most likely to encourage a positive relationship with the other parent," has "demonstrated a desire, willingness, and ability to engage in proper communication and cooperation with [Mother] regarding these decisions, which is consistent with good co-parenting," and "has demonstrated the ability" to make these decisions as in the children's best interest, while Mother has not.

28

admitting party from disputing it."). These mutual allegations are judicial admissions of a material and substantial change with respect to the rights they both sought to modify. *See, e.g.*, *Filla v. Filla*, No. 03-14-00502-CV, 2016 WL 4177236, at *4 (Tex. App.—Austin Aug. 5, 2016, pet. denied) (mem. op.) ("If an appellant filed her own petition to modify in the trial court and alleged a material and substantial change in circumstances, her allegation constitutes a judicial admission that a material and substantial change occurred."); *Burns v. Burns*, 434 S.W.3d 223, 228 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (assertions in pleadings can constitute judicial admissions).

Mother points to section 156.007 of the Family Code, asserting it prevents her counterpetition from being a judicial admission of any fact. Section 156.007 provides:

> A party who files a motion to modify an order . . . based on a material and substantial change of circumstances may not be considered on that basis alone to have admitted a material and substantial change of circumstances regarding any other matter.

TEX. FAM. CODE § 156.007.[8] We conclude the statute does not bar judicial admissions of changed circumstances with respect to the specific rights a party seeks to modify.

---

[8] This provision applies to motions to modify filed on or after September 1, 2021. *See* Act of June 4, 2021, 87th Leg., R.S., ch. 227, § 2–4, 2021 Tex. Sess. Law Serv. 506, 506. Mother's counterpetition filed on September 27, 2021, is subject to section 156.007.

Our primary objective in statutory interpretation is to ascertain and give effect to legislative intent. *Greater Hous. P'ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015). "We seek that intent first and foremost in the plain meaning of the text." *Id.* Section 156.007's plain language distinguishes between what is pleaded and what is not through its instruction that a motion based on changed circumstances "may not be considered on that basis alone to have admitted a material and substantial change of circumstance regarding *any other matter*." TEX. FAM. CODE § 156.007 (emphasis added). Affording "other" its common meaning as "not the same," the statute protects a party from judicially admitting changed circumstances only as to "*other*" rights they do not seek to modify. *See, e.g., Other*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/other.

This construction of the statute is consistent with the pre-enactment law, which the Legislature is presumed to know, recognizing that when a party pleads changed circumstances as to one aspect of the parent-child relationship, there is no admission of changed circumstances as to wholly different aspects. For example, in *Epps*, a mother's allegation of changed circumstances related to visitation and child support was not a judicial admission of changed circumstances related to the child's primary residence. 537 S.W.3d at 245–46; *see also In re J.C.J.*, No. 05-14-01449-CV, 2016 WL 345942, at *6 (Tex. App.—Dallas Jan. 28, 2016, no

30

pet.) (mem. op.) (allegation of material and substantial change for visitation was not a judicial admission of material and substantial change for child support).

Relying on section 156.007's plain language and the *Epps* precedent, we hold Mother judicially admitted changed circumstances in connection with the right to make medical, mental-health, and education decisions for the children, because she sought to modify that right herself based on a material and substantial change. However, she did not judicially admit changed circumstances regarding the right to designate the children's primary residence, because she did not seek to modify that right.

Mother's judicial admission disposes of her sufficiency-based complaint about the trial court's finding of a material and substantial change related to medical, mental-health, and education decisions, but even if it did not, we do not agree that the tiebreaker provisions in the agreed final decree compel a different conclusion. The crux of Mother's complaint is less about the evidence of changed circumstances regarding the children's medical, mental-health, and educational needs—as noted, the trial revealed a host of evolving issues on the educational and medical front for both children as well as behavioral issues for A.P.L.—and more about the trial court's appointment of Father as the exclusive decisionmaker. She argues the evidence of the children's evolving needs and parental conflict over how to handle those circumstances cannot support making Father the exclusive decisionmaker,

because the parties had disagreed before the divorce, anticipated more disagreement in the future, and thus included tiebreakers in the final decree.

In support, Mother cites this Court's statement in *Smith* that, "[i]f a circumstance was sufficiently contemplated at the time of an original agreement, its eventuality is not a changed circumstance, but instead an anticipated circumstance that cannot be evidence of a material or substantial change of circumstances." 546 S.W.3d at 740. There, our Court held a mother's desire to visit family in Kenya did not justify the trial court's modification allowing her to renew the child's passport because the parties knew before the divorce that the mother would eventually want to travel abroad with the child yet did not address it in their decree. *Id.* In other words, the desire to travel existed both at the time of divorce and during the modification proceedings and thus was not a change of circumstance. *Id.*

*Smith* is distinguishable. Unlike here, there was no judicial admission of changed circumstances as to the parental right at issue. It is true that Mother and Father's agreement to include tiebreaker provisions in the agreed final decree is evidence that they knew conflict over the children's medical, mental-health, and educational needs could arise after their divorce. What is different, however, is the undisputed evidence that the tiebreaking provisions failed in the time between the agreed final decree and the modification proceedings. Mother and Father both recognized at trial that the tiebreakers were not working, and so did the amicus

32

attorney. And more than one of the tie-breaking doctors declined to break ties or continue with care for the children because of Mother's and Father's acrimony. Mother agreed in her trial testimony that "any tiebreakers that [were] built into the decree should be thrown out the window, because they failed miserably."

We do not find support for Mother's contention that the trial court had to try something less disruptive, like modifying the tiebreaker provisions, before giving Father the exclusive right to make medical, mental-health, and education decisions. When the evidence shows that the parties are having trouble effectively co-parenting, communicating, or reaching shared decisions, a trial court generally is justified in selecting one parent as the exclusive decisionmaker to avoid conflict if doing so is in the child's best interest, which is a question we address below. *See, e.g.*, *Coburn v. Moreland*, 433 S.W.3d 809, 828 (Tex. App.—Austin 2014, no pet.) (where parties had ongoing conflicts about child's educational needs and activities, court did not abuse its discretion in selecting one parent as exclusive decisionmaker).

We overrule that part of Mother's first issue challenging the material and substantial change element of the modification of the right to make medical, mental-health, and education decisions.

## D. Best interests of the children

The trial court retains broad discretion in crafting the rights and duties of each conservator to promote the children's best interests. *See Lenz*, 79 S.W.3d at 19–20;

33

*Swaab v. Swaab*, 282 S.W.3d 519, 532 (Tex. App.—Houston [14th Dist.] 2008, pet. dism'd w.o.j.). The record evidence (even if conflicting) supports the trial court's decision that giving Father exclusive rights to designate the children's primary residence and to make medical, mental-health, and education decisions, and reducing Mother's time with the children, was in the children's best interests.

It is clear both parents love the children, and the children love both parents. As noted, there is no evidence of parental misconduct such as abuse, violence, or neglect in either home. But it is undisputed that Mother and Father have been unable to co-parent.[9] Each party blamed the other for the conflict. And the trial court heard overwhelming evidence of the parties' dislike for one another and opposing views on custody and possession, as well as their difficulties working together and with care professionals to address the children's individual needs, avoid making personal attacks, and not interfere with the other's relationship or time with the children. Given this evidence, we cannot conclude the trial court abused its discretion in selecting one parent as the exclusive decisionmaker to avoid further conflict and provide a measure of stability for important decisions about the children's medical, mental-health, and educational needs. *See Coburn*, 433 S.W.3d at 827–28. Based on the evidence, the trial court could reasonably conclude that it was in the children's

---

[9] The trial court's finding that "[t]he parties are unlikely to reach agreements about any issue that has a significant effect on the children's health and welfare" is unchallenged.

34

best interests for Father to be the decisionmaker as to these needs, as well as the parent with the right to designate the children's primary residence.

Mother contends that in ordering that the children live with Father, the trial court ignored T.L.'s preference to stay with her. T.L. told the trial court everything at home with Mother was "good" and admitted that he did not like "spending a lot of time" with Father's fiancée. But Mother's argument overlooks A.P.L.'s preference. She told the trial court that she wanted to live with Father in part because of how Mother made her feel. A.P.L. explained that Mother sometimes made her feel bad about herself, giving as one example Mother's comment during a doctor's office visit about A.P.L. "gaining weight." A.P.L. suggested that her negative feelings about Mother's comment contributed to weight loss of six pounds the next week. Asked if she would want to simply flip the possession schedule to see Mother as much as she was seeing Father, A.P.L. responded: "I want to have more time with my dad." It was within the trial court's discretion to weigh both children's statements in making its conservatorship decisions. *See City of Keller*, 168 S.W.3d at 819; *see also Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982) ("The trial court is given wide latitude in determining the best interests of a minor child.").

Regarding the children's welfare needs and the parents' ability to meet those needs, there is no doubt Mother was engaged with the children's care providers and attended more doctor's and therapeutic appointments with the children than Father.

35

But there is some evidence that Mother prioritized her negative relationship with Father in a way that contributed to lapses in the children's medical and educational care. For instance, there is evidence that Mother's opposition to Father's and the Private School's efforts to have A.P.L. undergo a psychoeducational evaluation contributed to a delay of more than a year in diagnosing A.P.L. with ADHD, which in turn made early intervention more difficult despite its importance and the impact on A.P.L.'s quality of life. After the trial court ordered a medicine trial for A.P.L., Mother contacted Dr. Katic about stopping the trial on the second day, listing a variety of negative symptoms A.P.L. was experiencing and then recorded A.P.L. leaving a voicemail for Dr. Katic expressing the same symptoms. In response, Dr. Katic suggested not continuing the medication and, instead of considering alternative treatments, recommended that A.P.L. find a different psychiatrist.[10] Based on this evidence, the trial court reasonably could have inferred that Mother did not participate in good faith in the medication trial or that she delayed A.P.L.'s access to treatment for her ADHD.

Even though it is conflicting, there is some evidence that Father accepted each child's diagnosis, supported medical and educational recommendations, and was

---

[10]    Other evidence suggested that Mother also refused to work cooperatively with Father to promptly address some of the at-risk behavior she observed from A.P.L. Although she complained that A.P.L. was making inappropriate social-media posts at Father's house, Mother waited until litigation began to provide Father copies of the videos.

36

more willing to engage in proper communication about the children's needs, consistent with appropriate co-parenting. And at trial, Father showed himself capable of recognizing Mother's importance in the children's lives, testifying that Mother "means well," "does good by the children," and "wants the best." In contrast, Mother expressed her belief that she is more important to the children than Father and was unconcerned during trial that she had not made any positive statements about Father. Email and text messages between the parties further suggest that Mother has called Father a "low life," "an incompetent parent," and suggested he talk to his doctor about "his meds." From this testimony, the trial court could reasonably conclude that Father was better able to support a positive co-parenting relationship in the future.

On this record, keeping in mind that the trial court was the sole decider of witness demeanor and credibility, and under the highly deferential standard of review applied in modification cases, we cannot conclude that the trial court abused its discretion when it concluded, as between the parents, that Father would be better suited to address the children's unique needs and to create a positive co-parenting dynamic, and that it was in the children's best interests to give him the exclusive rights to designate the children's primary residence and make medical, mental-health, and education decisions.

We overrule Mother's second issue.

**E.     Additional fact findings**

In connection with her complaints about the modification order, Mother argues in her third issue that the trial court's fact findings were deficient because they were not specific enough. In particular, she asserts the trial court was required to make specific findings explaining how each modification was connected to the changed circumstances and in the children's best interests.

In a bench trial, "any party may request the court to state in writing its findings of fact and conclusions of law." TEX. R. CIV. P. 296. If a party deems the court's findings and conclusions deficient in some respect, she may request "specified additional or amended findings or conclusions." TEX. R. CIV. P. 298. However, a trial court is required to make findings only on ultimate or controlling issues. *Rafferty v. Finstad*, 903 S.W.2d 374, 376 (Tex. App.—Houston [1st Dist.] 1995, writ denied). The ultimate or controlling issues in a modification proceeding are the best interest of the child and whether the circumstances have materially and substantially changed. *See* TEX. FAM. CODE § 156.101; *In re B.W.S.*, No. 05-15-01207-CV, 2016 WL 7163866, at *5 (Tex. App.—Dallas Nov. 23, 2016, no pet.) (mem. op.). The trial court made those and more findings here. Among other things, the trial court found that "the circumstances of [Mother, Father, and the children had] materially and substantially changed since the date" of the agreed final decree; that Mother and Father had "become unable to co-parent to promote the children's best interest"; that

38

the tiebreaker terms of the prior order [had] become ineffective"; that Mother "exposed the children to hostility directed at" Father; that Mother "attempted to minimize or thwart the children's contact with" Father; that the relationship between Mother and Father was "high-conflict . . . especially in the context of making medical, psychiatric/psychological, and educational decisions" and that such "difficulty [was] primarily prompted by [Mother's] disruptive and combative conduct, which was inconsistent with good co-parenting"; that Father was the parent most likely to encourage a positive relationship with the other parent . . . consistent with good co-parenting" and had "demonstrated an ability to make medical, psychiatric/psychological, educational and other decisions for the children" that were in the children's best interests; and that it was in the best interest of the children for Father to have the exclusive right to designate the children's primary residence and to make medical, psychiatric/psychological, and educational decisions.

The additional findings Mother requested "do no more than request explanations of the court's ruling in the case," and thus were not required. *See Dura-Stilts Co. v. Zachry*, 697 S.W.2d 658, 661 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.); *see also Stuckey Diamonds, Inc. v. Harris Cnty. Appraisal Dist.*, 93 S.W.3d 212, 213 (Tex. App.—Houston [14th Dist.] 2002, no pet.) ("Additional findings and conclusions are not required if they are merely

evidentiary, or aimed at tying down the court's reasoning rather than its conclusions.").

We overrule Mother's third issue.

## IV. Attorney's Fees

Section 109.001 of the Family Code provides the trial court discretion to make "any order necessary to preserve and protect the safety and welfare" of the children during an appeal in a suit affecting the parent-child relationship, including orders requiring payment of reasonable and necessary attorney's fees. TEX. FAM. CODE § 109.001(a)(5). Under this authority, the trial court entered a temporary order requiring Mother to pay Father's attorney's fees—$103,006 for responding to her post-trial emergency motion and $173,250 in conditional appellate fees—after finding it was necessary and equitable to do so. In her petition for writ of mandamus and appeal from the final modification order, Mother argues the temporary order is (1) void because the trial court issued it prematurely, outside of a fixed, sixty-day jurisdictional window, (2) void to the extent it awards fees the statute does not authorize, and (3) not supported by evidence.

## A. The temporary order is reviewable on appeal

There is a threshold question of whether Mother's mandamus or appeal is the appropriate vehicle to challenge the temporary order on attorney's fees. Section 109.001(c) provides that "[a] temporary order rendered under this section is not

40

subject to interlocutory appeal." TEX. FAM. CODE § 109.001(c).  Although there was a split of authority among the courts of appeals on the issue, this Court previously construed subsection (c) to mean that a trial court's ruling on a motion for temporary orders pending appeal is reviewable only by mandamus.  For example, *Marcus v. Smith* involved an appeal from an order dismissing a suit to enforce an adjudication of parentage, and the father included a complaint in his appeal about temporary orders requiring him to pay the mother's attorney's fees under section 109.001.  *See* 313 S.W.3d 408, 416 (Tex. App.—Houston [1st Dist.] 2009, no pet.).  This Court concluded it lacked jurisdiction to consider the complaint as part of the appeal; instead, a related mandamus filed by the father was the means to challenge the order. *Id.* at 415–16, 418.

The Legislature has since amended section 109.001 to add subsection (b–5), which states, "A party may seek review of the trial court's temporary order under this section by: (1) petition for writ of mandamus; or (2) proper assignment in the party's brief."  TEX. FAM. CODE § 109.001(b–5) (amended in 2017).  Given that a party can challenge a trial court's temporary order under section 109.001 by "proper assignment in the party's brief," we construe subsection (c) as barring review of a temporary order only through accelerated interlocutory appeal, but not as part of a direct appeal from a final judgment.  *See, e.g.*, *In re N.H.N.*, 580 S.W.3d 444–45 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (holding subsection (c) allows

temporary orders under section 109.001 to be challenged in direct appeal from final judgment); *In re Moore*, 511 S.W.3d 278, 286 (Tex. App.—Dallas 2016, no pet.) (same). To the extent *Marcus* or this Court's other decisions hold that a temporary order under section 109.001 is not reviewable as part of a direct appeal from a final judgment, we consider that holding to be superseded by statute.

Because we can (and do) address the temporary order on attorney's fees in Mother's appeal of the trial's court final modification order, we deny Mother's petition for writ of mandamus, but consider the issues raised in that petition in addressing her appellate argument. *See Walker v. Packer*, 827 S.W.2d 833, 840–41 (Tex. 1992) (orig. proceeding) (mandamus is inappropriate where relator has adequate remedy by appeal); *cf. In re Fuentes*, 506 S.W.3d 586, 592 (Tex. App.—Houston [1st Dist.] 2016, orig. proceeding) (mandamus review of temporary orders entered under sister provision in TEX. FAM. CODE § 6.709 for preservation of property during appeal is available only when review of order in conjunction with appeal is not adequate).

## B.    The temporary order is not void for prematurity

Mother contends the trial court lacked jurisdiction to award Father any attorney's fees under section 109.001 and as a result, the order is void. Specifically, she argues the temporary order is "void" because section 109.001 "has a strict temporal limitation" that confers the trial court with jurisdiction to grant relief "only

after an appeal has been perfected and within 60 days thereafter." Because here, the trial court entered the temporary order before the purportedly jurisdictional window opened with the filing of her notice of appeal, Mother contends the order is void. Father disagrees the order was premature but asserts that, even if it were, we should overrule Mother's issue because any error in the order's timing is not jurisdictional.

"Jurisdiction" refers to a court's authority to adjudicate a case. *Reiss v. Reiss*, 118 S.W.3d 439, 443 (Tex. 2003). If a trial court lacks jurisdiction over the parties or the subject matter or acts outside its capacity as a court, its order is "void." *Id.* In contrast, an order is merely "voidable" if it results from errors other than lack of jurisdiction, such as actions that violate a statute, which may be corrected through the ordinary appellate process or other proper proceedings. *Id.*; *see Comm'n for Lawyer Discipline v. Schaefer*, 364 S.W.3d 831, 836 (Tex. 2012) (per curiam) (violations of procedural rules, statutes, and constitutional requirements "generally only result in a 'voidable' or erroneous judgment" rather than void judgment).

In civil cases, including cases under the Family Code, "[a] trial court retains jurisdiction over a case for 30 days after it signs a final judgment or order." *Martin v. Tex. Dep't of Family & Protective Servs.*, 176 S.W.3d 390, 392 (Tex. App.— Houston [1st Dist.] 2004, no pet.) (citing TEX. R. CIV. P. 329b(d)). When, as here, a motion for new trial is timely filed, the trial court's plenary power is extended until

43

thirty days after the motion is overruled by written order or operation of law, whichever occurs first.  TEX. R. CIV. P. 329b(e).

While the trial court still had plenary power, and before she filed her notice of appeal, Mother filed a post-judgment motion expressing her intention to appeal and requesting abatement of the modification order pending the appeal under section 109.001.  In opposing Mother's motion to abate, Father sought attorney's fees under the same statute to preserve and protect the children's welfare during the anticipated appeal, which the trial court awarded.

Section 109.001(a) provides:

> (a)  In a suit affecting the parent-child relationship, on the motion of any party or on the court's own motion and after notice and hearing, the court may make any order necessary to preserve and protect the safety and welfare of the child during the pendency of an appeal as the court may deem necessary and equitable.  In addition to other matters, an order may:
>
> . . .
>
> (5)  require payment of reasonable and necessary attorney's fees and expenses[.[11]]

TEX. FAM. CODE § 109.001(a)(5).  Relevant here, the statute prescribes a timeline, stating in subsection (b–2) that the "trial court retains jurisdiction to conduct a

---

[11]  Effective September 1, 2025, the Legislature amended section 109.001(a)(5) to authorize awards of court costs in addition to attorney's fees and expenses.  *See* 2025 TEX. SESS. LAW SERV. Ch. 593 (H.B. 2524).  No costs are at issue, and we apply the version of the statute in effect when the trial court rendered the temporary order.

hearing and sign a temporary order under this section until the 60th day after the date any eligible party has filed a notice of appeal from final judgment under the Texas Rules of Appellate Procedure." *Id.* § 109.001(b–2).

Mother asserts that the phrase "during the pendency of the appeal" in subsection (a) and the sixty-day deadline in subsection (b–2), read together, create a jurisdictional window for the issuance of temporary orders that opens when any eligible party files a notice of appeal from a final judgment and closes sixty days later. Because the trial court entered the temporary order on attorney's fees nine days before Mother filed her notice of appeal, Mother contends the order is premature, falls outside the jurisdictional window, and is thus void and must be vacated.

Mother cites several cases in support of her statutory construction. *See, e.g.*, *Morris v. Veilleux*, No. 03-22-00178-CV, 2023 WL 8191911, at \*3 (Tex. App.—Austin Nov. 28, 2023, no pet.) (mem. op.); *In re Reardon*, 514 S.W.3d 919, 924 (Tex. App.—Fort Worth 2017, orig. proceeding); *Marcus*, 313 S.W.3d at 416; *In re K.M.*, No. 02-04-00044-CV, 2004 WL 2569384, at \*8 (Tex. App.—Fort Worth Nov. 12, 2004, pet. denied) (per curiam) (mem. op.). None of the cited cases involves a section 109.001 order being declared void for prematurity. That is, in none of the cited cases did a court determine when a trial court must *first* act under section

45

109.001. One case concerns when a trial court may *last* act under the statute and the rest provide only general context without analysis or full consideration of the issue.

For instance, in *Morris*, the temporary order issued too late. There, the father appealed a final divorce decree, and the mother moved under section 109.001 for the father to pay her appellate attorney's fees to preserve and protect the children's welfare. *Morris*, 2023 WL 8191911, at *3. The trial court initially denied the request, stating that it "maintain[ed] plenary power and reserve[d] the right to award attorney's fees after" the appellate court ruled. *Id.* After the appellate court issued its judgment and remanded the case to the trial court, the trial court awarded the mother her appellate attorney's fees. *Id.* The appellate court vacated the order, noting that the statute's plain purpose "is to ensure that, while the appeal is pending, the children's safety and welfare is preserved and protected." *Id.* The court reasoned that an order awarding fees after an appeal is "too late to protect and preserve the children's safety and welfare *during the appeal's pendency* and no longer serves the purpose underpinning" the statute. *Id.* (emphasis in original). Thus, while *Morris* is instructive on when it is too late for the trial court to grant relief under section 109.001, it is not instructive on how early a trial court may act under the statute.

Likewise, the issue in *Reardon* was not the trial court's jurisdiction to grant relief under section 109.001. There, the father petitioned the appellate court for a writ of prohibition to prevent the trial court from modifying a final order in a suit

affecting the parent-child relationship under Title 5, Subtitle B of the Family Code while the appeal of that order was pending. *Reardon*, 514 S.W.3d at 921. The father argued that allowing such a modification under Subtitle B would not only moot the pending appeal but render section 109.001, under Subtitle A, meaningless. *Id.* at 923. While the appellate court generally described the window in which a trial court may act under section 109.001 in answering this question and the interplay between Subtitles A and B, a section 109.001 order was not the subject of the appeal. *Id.* at 924–25.

Mother also points to statements in *K.M.* and *Marcus* that a "temporary order under section 109.001 is only appropriate if a final judgment has been signed and a notice of appeal has been filed" as support for her contention that the trial court could not order attorney's fees before she appealed. *See Marcus*, 313 S.W.3d at 416; *K.M.*, 2004 WL 2569384, at *8. The sole authority *Marcus* cites for this statement is *K.M.*, which in turn cites only the statute itself, without any analysis. *See K.M.*, 2004 WL 2569384, at *8. Importantly, neither *Marcus* nor *K.M.* involved a question of the *trial court's* jurisdiction to enter temporary orders under section 109.001; rather, they both concerned the *appellate court's* jurisdiction to review such orders under the previous version of the statute that prohibited accelerated interlocutory appeals from section 109.001 orders. *See Marcus*, 313 S.W.3d at 416 (holding it lacked jurisdiction to review section 109.001 order on direct appeal because the order was

interlocutory); *K.M.*, 2004 WL 2569384, at *8 (same). While *Marcus* includes some discussion on the merits of the section 109.001 order,[12] the discussion is limited to the sufficiency of the evidence supporting the necessity of attorney's fees to preserve and protect the safety and welfare of the child and the unconditional nature of the fee award. 313 S.W.3d at 418. Accordingly, we conclude the statements Mother relies on are dicta.[13]

Mother has not cited (nor have we found) any case holding that section 109.001's language deprives the trial court of jurisdiction to issue a temporary order before a party files a notice of appeal from a final judgment. Considering section 109.001 as a whole and the ordinary meaning of the words used, we conclude the statutory language does not have that effect.

The plain purpose of section 109.001 is to preserve and protect the children's safety and welfare during an appeal in a suit affecting the parent-child relationship.

---

[12] The court considered the temporary order on mandamus review. *See Marcus*, 313 S.W.3d at 418.

[13] The same is true for the cases Mother cites on Family Code section 6.709, a parallel statute authorizing orders necessary in divorce suits to preserve property or protect the parties during an appeal. *See* TEX. FAM. CODE § 6.709. For instance, in *Fuentes v. Zaragoza*, this Court referenced the extension of the trial court's plenary power under section 6.709 as a "jurisdictional window" that began to run when the appellant "perfected his appeal." 534 S.W.3d 658, 663 (Tex. App.—Houston [1st Dist.] 2017, no pet.). But again, that statement was about calculating the final date on which the trial court had jurisdiction to act under section 6.709, not the first. *See id.* (holding appointment of receiver under section 6.709(a) was not authorized because the order was issued after expiration of the 30-day jurisdictional limitation in the statute).

*Morris*, 2023 WL 8191911, at *3. Nothing in the statute suggests that the phrase "during the pendency of an appeal" in subsection (a) limits the court's ability to act only after a notice of appeal is filed. *See* TEX. FAM. CODE § 109.001(a). Instead, the phrase relates to the immediately preceding phrase stating that the court may make any order necessary to "preserve and protect the safety and welfare of the child." That is, as Father asserts, the phrase describes relief that a trial court may deem "necessary" and "equitable" to grant relief that will "preserve and protect the safety and welfare of the child during the pendency of an appeal."

Mother's argument that section 109.001(a) creates a limited 60-day jurisdictional window that starts upon the filing of a notice of appeal is further discounted by the fact the statute expressly states that the court *retains* jurisdiction to act under the statute. Specifically, under subsection (b–2), the trial court "retains jurisdiction" to conduct hearings and sign temporary orders granting such relief "until the 60th day after the date any eligible party has filed a notice of appeal[.]" TEX. FAM. CODE § 109.001(b–2). To "retain" means "to hold in possession or under control; to keep and not lose, part with, or dismiss." *Retain*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also Retain*, MERRIAM-WEBSTER.COM, http://merriam-webster.com/dictionary/retain (defining "retain" as to "keep in possession or use" or "hold secure or intact"). And "until" is "used as a function word to indicate continuance . . . to a specified time." *Until*,

49

MERRIAM-WEBSTER.COM, http://merriam-webster.com/dictionary/until. Applying the common understanding of these words, subsection (b–2) can be read only as extending the power of the court to act under the statute, not as creating a jurisdictional window that commences only upon the filing of a notice of appeal. That is, subsection (b–2) prescribes how long the trial court's jurisdiction extends before it is lost, not when it begins. The Legislature saw fit to use language indicating when the trial court's jurisdiction under section 109.001 ends and could have easily used language indicating that such jurisdiction begins when a notice of appeal is filed but did not do so. *See, e.g.*, *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015) (per curiam) ("Had the Legislature intended to limit the Act to publicly communicated speech, it could have easily added language to that effect.").[14]

We find nothing in section 109.001 that prescribes a consequence for an allegedly premature order or that can be read as depriving the trial court of jurisdiction to issue a temporary order after a final judgment has been issued but

---

[14]   We note that subsection (b–1) provides that a motion under section 109.001 "may be filed before trial" and "may not be filed by a party after the date by which that party is required to file the party's notice of appeal[.]" *See* TEX. FAM. CODE § 109.001(b–1). While this does not pertain to when the trial court is supposed to rule on the motion, it supports that section 109.001 is not something to put off unless a notice of appeal is filed. Indeed, as we have discussed, Mother was the first party to file a motion seeking section 109.001 relief, and she proceeded on the hearing on her motion (and Father's motion) before filing her notice of appeal.

before an appeal is perfected. *See* TEX. R. CIV. P. 329b(d), (e) (when a motion for new trial is filed, trial court has plenary power until 105 days after judgment was signed). Accordingly, we hold that the temporary order is not void for prematurity. We overrule that part of Mother's fourth issue complaining that the temporary order was issued too early.

## C. The temporary order is not void because it awards non-appellate fees

Mother also challenges the temporary order on attorney's fees on a second jurisdictional ground. She argues that the order is "void to the extent it awarded [Father] past fees for responding to [her] emergency motion" because section 109.001 authorizes only appellate fees.

There is no dispute that some of the attorney's fees the trial court ordered Mother to pay are not appellate fees but instead are fees Father incurred before the appeal in responding to Mother's post-judgment motion to abate. Assuming without deciding that the statute authorizes only appellate fees, Mother has offered no authority for her contention that awarding fees other than for appellate work is a jurisdictional defect that renders the order void rather than a non-jurisdictional error that makes the order merely voidable.[15] We find no support for that contention in

---

[15] Both Mother and Father sought post-judgment attorney's fees under section 109.001 in connection with Mother's motion to abate. Having both requested post-judgment fees, neither objected in the trial court to the availability of such fees under section 109.001.

51

either the plain language of section 109.001 or the case law. Instead, a trial court's order granting relief that is neither necessary to preserve and protect the children's welfare during an appeal nor equitable, including potentially attorney's fees for work performed before the appeal, is non-jurisdictional error that renders the order voidable or erroneous rather than void. *See In re Masonite Corp.*, 997 S.W.2d 194, 198 (Tex. 1999) (explaining that while the trial court's transfer orders were an abuse of discretion and thus erroneous they were not void because the mere fact that an action of a trial court is contrary to a statute makes the action not void but voidable or erroneous); *see also Tex. Windstorm Ins. Ass'n v. Pruski*, 689 S.W.3d 887, 893 (Tex. 2024) ("[F]ailure to comply with a statute, while it may render a judgment erroneous and voidable, does not necessarily render the judgment void"); *In re Panchakarla*, 602 S.W.3d 536, 540 (Tex. 2020) (per curiam) ("[A]s a general proposition, we are hesitant to conclude that a trial court's jurisdiction is curtailed absent manifestation of legislative intent to that effect[.]").

We overrule that part of Mother's fourth issue complaining that the temporary order is void to the extent it awarded past fees.

**D.     Sufficient evidence supports the equity and necessity of attorney's fees**

Mother next argues the temporary order on attorney's fees is an abuse of the trial court's discretion because Father (1) judicially admitted there was no threat to the children's safety or welfare and (2) failed to present legally and factually

sufficient evidence that the fees he sought were equitable and necessary to preserve or protect the children's welfare during the appeal, as required by section 109.001.

Mother points to a statement in Father's response to her motion to abate disputing whether she could satisfy her burden to "show the current situation threatens or endangers the safety or welfare of the children or that the relief she requests would be appropriate, much less necessary."  In her motion to abate, Mother specifically alleged that Father had not met the children's medical and educational needs since rendition and specifically asked the trial court to temporarily restore her right to make decisions in those areas, give her more time with the children, and order A.P.L.'s enrollment at the specific public school A.P.L. preferred.  Father's response putting Mother to her burden to show the necessity of such relief under the statute is not a judicial admission that the attorney's fees he sought were unnecessary.  *See Regency Advantage Ltd. P'ship v. Bingo Idea-Watauga, Inc.*, 936 S.W.2d 275, 278 (Tex. 1996) (per curiam) (judicial admission must be clear, deliberate, and unequivocal).

As the party moving for the award under section 109.001, Father had the burden to prove the attorney's fees were equitable and necessary to preserve and protect the children's safety and welfare during the appeal.  *See* TEX. FAM. CODE § 109.001(a); *McCain v. McCain*, 636 S.W.3d 679, 684 (Tex. App.—Austin 2021,

no pet.). After reviewing the record, we conclude the trial court's decision to award Father attorney's fees was not arbitrary or unreasonable considering the evidence.

Mother asserts Father did not prove that "he could not afford to pay for his portion of the children's basic needs or that the children would lack any necessity if the trial court did not award him" attorney's fees. She emphasizes the trial court's finding in the modification proceeding that Father did not need child support and no longer has to pay it himself as well as Father's own testimony that he earns about $250,000 per year, had a contract to sell his home for more than $1 million, and had moved into a new home that he was not financially responsible for after remarrying. She draws a contrast between this evidence of Father's resources and her own, pointing to the trial court's earlier finding that she "has no stable source of income or resources" and has relied on family to pay her own attorneys and her own testimony that she had also borrowed money and could not pay for the legal fees for bringing her motion to abate. In Mother's view, this contrast compelled a conclusion that Father could afford to pay his own attorney's fees, but she could not.

We disagree that the trial court's finding in the modification proceeding that Father can provide for the children without the amount of support Mother would pay under the child-support guidelines precludes a subsequent finding that the financial strain of continued litigation jeopardizes Father's ability to meet the children's welfare needs during the appeal. Since rendition, Father has had primary

responsibility for the children, who each require the service of various tutors, therapists, and other specialists to address unique medical needs and learning differences. Father testified that he is "in debt up to [his] eyeballs" and owes more than $200,000 in family loans and credit-card debt from the litigation, and his attorney testified that Father would incur another $173,250 in fees to defend the modification order as in the best interests of the children on appeal.

Despite working two jobs to earn about $250,000 per year, Father described the financial impact of the ongoing litigation as "significant" on the children. He testified that he had to use savings intended for the children's college expenses to pay for the litigation. He testified that insurance coverage for T.L.'s growth hormone was becoming more difficult and he could not afford to pay his portion of the cost out of pocket. And he was not making payments on the new family home because he could not afford to do so. Father also points to Mother's testimony in the modification proceedings that she had paid off the mortgage on her home and receives money from her family for living expenses and attorney's fees (even though she described those funds as a loan).

The trial court could believe Father and disbelieve Mother. *See City of Keller*, 168 S.W.3d at 819. Viewed in the appropriate light, the evidence was legally and factually sufficient to support the exercise of the trial court's broad discretion to deem an award of attorney's fees to Father both equitable and necessary to preserve

and protect the children's safety and welfare during the appeal. *See Marcus*, 313 S.W.3d at 418 (affirming award for recipient who had primary responsibility for caring for child and child's principal home, a "lack of funds," and "still owe[d] [her attorney] money"); *see also McCain*, 636 S.W.3d at 685 (affirming award for recipient who, despite living with her parents for free, could not pay to defend appeal after borrowing to pay trial counsel's retainer and incurring $50,000 for trial court proceedings). The trial court's decision to award the fees was neither arbitrary nor unreasonable.

We overrule that part of Mother's fourth issue challenging the temporary order on attorney's fees as unsupported by the evidence.[16]

---

[16] To the extent Mother's fourth issue asserts the trial court abused its discretion by awarding attorney's fees as a sanction against Mother, the record does not support that the fees were awarded as a sanction. Although Father requested fees alternatively under Texas Rule of Civil Procedure 13 and Chapter 10 of the Civil Practice and Remedies Code, the temporary order expressly granted relief under section 109.001 only. *See* TEX. CIV. PRAC. & REM. CODE § 10.001–.006 (frivolous pleadings); TEX. R. CIV. P. 13 (groundless pleadings).

## V. Conclusion

For the reasons above, we deny Mother's petition for writ of mandamus and affirm the trial court's judgment.

Andrew Johnson
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.